# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

LARRAINE K. TIPPIE,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C10-4076-PAZ

**MEMORANDUM OPINION AND
ORDER**

---

### *Introduction*

    This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The plaintiff Larraine K. Tippie claims the administrative record ("AR") does not contain substantial evidence to support the ALJ's decision that she is not disabled.

    Tippie filed an application for DIB on July 13, 2007, alleging a disability onset date of July 6, 2007. Her claim was denied initially and on reconsideration. She filed a request for hearing, and a hearing was held before an ALJ on June 3, 2009. Tippie was represented at the hearing by an attorney. Tippie and a vocational expert ("VE") testified. On July 29, 2009, the ALJ issued his decision, finding that, although Tippie had a severe impairment, Meniere's Disease,[1] her impairment did not reach the Listing level of severity. He also found that she retained the residual functional capacity ("RFC") to perform her past relevant work both as a housekeeper and as a secretary. Based on these findings, the ALJ decided that Tippie was not disabled for purposes of the Social Security Act.

---

[1] "[A] condition that causes occasional episodes of vertigo and vomiting." *Perkins v. St. Louis Cnty. Water Co.*, 160 F.3d 446, 448 (8th Cir. 1998).

Tippie filed a timely Complaint in this court seeking judicial review of the ALJ's decision. On September 17, 2010, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted.

The court must decide whether the ALJ applied the correct legal standards and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

The court first will summarize the testimony at the ALJ hearing, and then will review the other evidence in the record.

## Hearing Testimony

At the time of the ALJ hearing, Tippie was fifty-four years old, and was 5'3 3/4" tall and weighed 145 pounds. She was married and lived with her husband. She had a twelfth grade education, with no post-high school education or training. She had a valid, unrestricted drivers' license.

Tippie last worked in July 2007, as the head housekeeper at a motel. She left the housekeeper job because of the developing symptoms of Meniere's disease. She testified that these symptoms caused her to miss work frequently, and her employer was afraid she would have an accident while working. She had problems with her cognitive skills, and was not able to be organized or efficient, so she would make mistakes. She had surgery in April 2007 to help control her symptoms. The surgery helped, but she continued to

have problems, so she left her job. She testified that she would not be able to return to any of her past jobs.[2]

Tippie testified she has episodes during which she is not able to walk straight. She testified that, since the surgery, she still has severe episodes, "just not extreme ones." She testified, "[T]hey did the surgery on the left side only. The fullness that I feel in the left side of my head, the tinnitus, which is the noise, the rushing and roaring sound is constant. At times, that increases to such a loud roaring, sort of a rushing engine-y sound. It's hard to describe, and that is a temporary thing, but that happens frequently." AR 30. She testified that the "fullness" is constant. "It's like having a plugged up ear, and [her] head feels stuffed with cotton." AR 31. Several times a month, the roaring noise increases to the extent it overwhelms her and she needs to lie down. She also has headaches.

Tippie testified that she has vertigo at least "to a slight degree all the time." She described this as a "movement, motion, swimming kind of feeling" that makes her feel unsteady and unbalanced. She has an episode of vertigo nearly every day, and sometimes more than once a day. Once or twice a week, she has an episode so severe that she has to lie down for between 10 minutes and an hour. Motion, stress, bending over, and standing seem to trigger the vertigo, although sometimes she will have an episode when she is simply sitting down or using a computer. She cannot sit at her computer for two hours without having problems focusing and concentrating. After standing for between 10 and 15 minutes, she has to sit down and rest. However, she has no problem sitting on a couch watching television. AR 38-39.

She does have problems walking. She uses the stairs in her house, but she has to hold on to something when she goes up and down. She avoids escalators. She does not drive a car or climb ladders. She does not believe she could lift more than 10 pounds because "[u]sually when you lift something, your bending, and bending is one of my

---

[2] Before working as a housekeeper, Tippie had worked as a secretary and as a laborer.

problems." AR 40. She testified that she believes she could carry up to 10 pounds, although she also believes that carrying would be more difficult than lifting.

Tippe testified that she takes meclizine for the vertigo, but has not been prescribed any medicine for the tinnitus. She takes Zoloft for depression, which seems to have been brought on by stressful family issues.[3] She also takes Thiazide and Serax. She has no side effects from any of her medications. AR 44-45.

Tippie testified that reading used to be one of her favorite pastimes, but now she cannot read for very long because her mind gets muddled and she has to reread passages. AR 26. She used to pay the bills, but now has trouble with addition and subtraction, so her husband has taken over this task. AR 26-27. Her husband has secondary progressive multiple sclerosis, so she is the primary household "keeper upper." AR 49-50. She dusts and vacuums, but can do only one room per day. AR 43. She also cooks, cleans, and does laundry, but has to do these tasks in stages. AR 44. She can go to the grocery store by herself, if necessary, but is afraid to drive more than a few blocks. *Id.*

After her surgery, Tippie's doctor told her not to climb ladders and to avoid other situations where she might fall. Otherwise, no doctor has put any limitations on her activities because of Meniere's. AR 52.

The ALJ asked the VE the following hypothetical question:

> Assume . . . that you are looking at an individual between the ages of 52 and . . . 55; high school education individual; work history [the same as Tippie's] an individual with medically determinable impairment causing the same work-related limitations described by Mrs. Tippie in her testimony here today. Finding that testimony to be accurate and factual, what, if anything, are the vocational consequences of that finding?

AR 55. The VE responded as follows:

> From an exertional standpoint, she can't do the housekeeper/laborer job, and I think she testified that as far as

---

[3] She has no other mental health history.

4

the secretary, the sitting kind of job, she indicated that some, her cognitive skills, ability to concentrate is not as good, so we would have to rule that one out. Also, I think her ability to sit is less than two hours, and I don't know if that's a total time or, but at any rate, she probably isn't going to be able to sit in a job for long enough to meet the break requirements of a typical kind of job, and then there's also some problems with the episodes of vertigo and the ringing in the ears. Those would probably cause some need to withdraw frm the work situation. I think she lays down at times. Although it didn't seem like it was a whole lot, but there are periods of time where she does that. It doesn't stand, her standing tolerance is poor, too. I'm not sure that all this adds up to a full-time work schedule[.]

AR 56.

The ALJ asked the VE a second hypothetical question:

The second hypothetical is intended to ask you about the State Agency's assessment . . . . Please assume an individual of the same age, education, and work experience as before who could occasionally life or carry 20 pounds, frequently ten pounds; could stand, walk, or sit about six of eight hours with normal breaks; push/pull is unlimited; posturally, postural activities could be performed occasionally with one exception, no climbing of ladders, ropes, or scaffolds; no manipulative limits; no visual limits; no communicative limits; environmental limitations, avoid even moderate exposure to hazardous working conditions. Can we accurately describe this as safe light work? . . . Is it consistent with her past work?

AR 56-57. The VE responded as follows:

It's consistent with the secretarial job, clerical work, and it's consistent with the housekeeping job as it's described in the DOT. However, it's not consistent with the way she performed that job. That was at the medium duty level. And the laborer job is to heavy, and she performed it at medium so that's ruled out.

AR 57. The VE clarified that there would probably be "some reduction in the full range of unskilled probably related to the hazards, machinery, heights. There might be some

5

light machine operator unskilled jobs that would be ruled out.  However, there would be significant numbers of light jobs that would fit the hypothetical." *Id.*

The ALJ asked the VE whether the hypothetical person could perform any of Tippie's past jobs if he accepted as credible the limitations set out in a letter to the state agency from Dr. Michael M. Paparella, one of Tippie's doctors.[4]  The VE testified that, because of the restrictions on the length of time the hypothetical person could sit, stand, and walk, the person would not be functional.  AR 58.

---

[4] In a letter dated July 23, 2007, Dr. Paparella wrote the following about Tippie's limitations:

1.  Lifting and carrying heavy objects would disturb her vestibular upset and make her dizziness worse.

2.  Any prolonged standing, walking and sometimes even sitting could exacerbate her Meniere's disease and make her vestibular symptoms and other related symptoms worse.

3.  Stooping, climbing, kneeling and crawling would definitely cause a great deal of dizziness and incapacitation and would disturb her condition considerably.

4.  She would have some difficulties with hearing, handling and traveling but vision and speaking should not be affected.

5.  She actually should not work near loud noise and of course dust fumes and temperature and other hazards could be difficult for her as well.

AR 299.

*Summary of Medical Evidence*

**A.    Michael M. Paparella, M.D.**

On February 20, 2007, Tippie was referred to Dr. Paparella for her complaints of dizziness.  AR 293-94.  Dr. Paparella noted as follows:

> [Tippie] has a sensation of vertigo[,] not spinning vertigo, but that things move from right to left.  This can last for an hour or it can last a lot longer. A more severe attack happens about once a week and she is bed-ridden when this happens.  The dizziness has been bad for the past 3 years.  She also has off balance[,] imbalance feelings between these, and superimposed motion related dizziness.

> She has noticed fluctuating hearing loss in the left ear[,] pressure in the left ear constant for the past 3 to 4 years and it gets worse on occasion.  She has roaring tinnitus in the left ear, bad for 3 to 4 years and worse on occasion. She does describe loudness intolerance, as well.

> She is not certain that the symptoms occur together.  She has been worse in the past few months as well.

> She has taken Dyazide for the past few months and I think that is a good idea.  Her dizziness has been especially bad for the past 2 weeks.

AR 293.  "It is my impression that this patient has a variant of Meniere's disease and if she is having severe enough trouble she may be a candidate for sac enhancement."  *Id.* Dr. Paparella advised Tippie to schedule a follow-up visit to consider her treatment options.  *Id.*

On April 3, 2007, Dr. Paparella noted that X-rays of Tippie's sigmoid sinus were consistent with a diagnosis of vestibular Meniere's disease in her left ear.  AR 295.  Tippie agreed to "an extension of conservative therapy to consist of endolymphatic sac enhancement; sigmoid sinus decompression; via extended facial recess approach; via complete mastoidectomy along with myringotomy and tube on the left ear."  *Id.*  She underwent surgery on April 30, 2007.  AR 309-10.

7

On May 8, 2007, Dr. Paparella noted that Tippie "seem[ed] to be doing quite well" a week after her surgery and that progress was "satisfactory." AR 296.

On July 11, 2007, Dr. Paparella noted that Tippie's "severe episodes are much better," although she "continues to have symptoms." AR 297. "She has to drive 36 miles to go to work and she continues to have some disequilibrium. . . . She has symptoms even on the opposite side." *Id.*

On October 24, 2007, Dr. Paparella noted that Tippie continued "to have vestibular episodes. Her dizzy spells and occasionally vertigo spells are not as severe as they were prior to her sac enhancement . . . ." AR 303. "However, recently she has noticed pressure in the right ear as well as in her left ear – perhaps not as severe, but she appears to have some early symptoms of Meniere's or hydrops on the right ear." *Id.* Dr. Paparella continued prescribing Tippie her medications. *Id.*

On February 8, 2008, Dr. Paparella completed a questionnaire regarding Tippie's impairments. AR 343-48. He noted that he had treated Tippie since February 20, 2007, and opined that the severity of her impairments regarding her "balance system" varied, but that they were disabling and caused her to be unable to perform her previous job or other similar work. AR 343. Stress could also have an adverse effect on Tippie's impairments. *Id.* According to Dr. Paparella, Tippie's impairments caused her to be unable to focus and to concentrate on conversations, affecting her ability to see and to speak. *Id.* Activities such as bending, brushing teeth, stress, lifting, and going up and down stairs would cause her dizziness and aggravate her impairments. AR 344. Tippie's medical condition had not improved since Dr. Paparella first began treating her, but her condition had improved since the first development of her impairments. *Id.* She had followed Dr. Paparella's prescribed treatment, and she was not a malingerer. *Id.* Tippie's impairments were reasonably consistent with the symptoms of dizziness and limitations described in the questionnaire. *Id.* She "frequently" experienced pain sufficiently severe to interfere with attention and concentration. *Id.*

Dr. Paparella also evaluated Tippie's physical capacity on February 8, 2008. AR 346-48. According to Dr. Paparella, Tippie could occasionally lift (but seldom carry) up to 10 pounds. AR 346. She could frequently reach, handle, finger, and operate foot controls. *Id.* She could seldom stoop and occasionally reach above shoulder level, but never squat, crawl, or climb. AR 347. Tippie should be seldom exposed to marked changes in temperature and humidity, but never exposed to unprotected heights, moving machinery, driving automotive equipment, and exposure to dust, fumes, and gases. *Id.* Tippie would "never" be able to perform at a rapid pace. *Id.* She would "frequently" need to perform at a slow pace. *Id.* Dr. Paparella opined that Tippie would need to walk around while in a work setting and to leave a work station other than at a scheduled break, but he did not indicate how often or for how long. *Id.*

On February 27, 2008, Dr. Paparella noted that Tippie's "hearing is normal, but even though the sac enhancement helped to improved somewhat her dizziness, she still has episodes a couple or three times per week. She has pressure and tinnitus worse on the left ear. These are episodes of spinning vertigo." AR 385. "Again, this is in both ears, but the left ear seems to be the predominant ear." *Id.* Dr. Paparella opined that the next treatment option should be intratympanic Gentamicin. *Id.*

In a letter dated March 7, 2008, Dr. Paparella opined as follows:

[Tippie] does have Meniere's disease which was diagnosed in February 2007. The patient's main symptoms are dizziness; sensation of vertigo; tinnitus and fluctuating hearing loss. The patient was treated with medicine for a while with minimal improvement. Then the patient was treated with surgery in April of 2007, a left endolymphatic sac enhancement; sigmoid sinus decompression; myringotomy and tube placement.

After surgery the patient's symptoms improved. However, the sensation of vertigo still is significant enough to affect her capability to perform her job.

AR 349.

On May 22, 2009, Tippie reported to Dr. Paparella that she had "noticed that the tinnitus is on the right ear, although it is more noticeable on her left ear. It is the left ear that had the procedure, but she is now developing tinnitus on that side." AR 383. "She does not get the prolonged episodes of vertigo but does have disequilibrium and off balance sensations and superimposed by motion related or postural dizziness." *Id.*

On June 3, 2009, Dr. Paparella wrote a letter to Tippie's attorney stating as follows:

> This is a 54-year-old pleasant patient who is having vestibular episodes; dizzy spells. This dizziness has been bad for the past 5 years. She also has off balance/imbalance feelings between these episodes of vertigo and also superimposed motion-related sickness.
>
> She has fluctuating hearing loss on both sides for more than 5 years as well as roaring tinnitus in the left ear. She also describes loudness intolerance, as well. These episodes of vertigo can last for an hour, sometimes a lot longer. She had left endolymphatic sac enhancement; sigmoid sinus decompression; complete mastoidectomy; myringotomy and tube operations done on the left on 4/30/2007.
>
> She is on Dyazide every 12 hours and meclizine, as well. She is on regular follow-up every 4 months for medical and diagnostic follow-up. There is no change in her situation since the last visit and she is still having trouble with vertigo, tinnitus and pressure headaches. Her medical condition has not improved since her first visit.
>
> Restrictions regarding lifting; carrying already noted on her evaluation sheet still apply to this patient's situation. Because of the nature of the disease and onset of episodes of vertigo can be at any time in a day and duration mostly varies from 1 hour to all day. Basically this letter emphasizes that there is no change in the patient's medical situation since her last visit.

AR 387-88.

## B.    *State Agency Medical Consultants*

On August 3, 2007, Jan Hunter, D.O., a state agency medical consultant, found that the "sac procedure done by Dr. Paparella is considered conservative treatment, first line therapy and there are certainly many other options. Since her onset is current (07/2007)

we will need to develop this further to see whether different interventions result in some improvement." AR 300.

On November 9, 2007, Dr. Hunter assessed Tippie's physical RFC. AR 321-25. Dr. Hunter opined that Tippie could (1) lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) push and/or pull without limitation. AR 319. Because of her vertigo, Tippie could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (but never ladders, ropes, or scaffolds). AR 320. Tippie had no manipulative, visual, or communicative limitations, but she was to avoid moderate exposure to hazards such as machinery and heights because of her vertigo. AR 321-22. Dr. Hunter noted Dr. Paparella's July 23, 2007, letter "indicating that lifting and carrying objects would make [Tippie's] dizziness worse [and that] prolonged standing, walking, and sometimes even sitting could exacerbate her disease." AR 320. Dr. Hunter found, however, that "[b]y [Tippie's] own account she is able to perform a fairly broad range of activities of daily living which are considered consistent with the restrictions outlined herein. The preponderance of all the evidence in this claim supports the conclusion that [Tippie] is capable of performing as outlined" in the doctor's RFC assessment. *Id.* Dr. Hunter also found "no objective criteria to support" Dr. Paparella's opinion that Tippie "would have difficulty with prolonged sitting." AR 324. Another state agency consultant affirmed Dr. Hunter's assessment on April 9, 2008. AR 350.

On November 15, 2007, John Tedesco, Ph.D., another state agency medical consultant, completed a psychiatric review technique form in which he opined that Tippie's anxiety disorder was not severe. AR 326, 331. Dr. Tedesco found that her mental impairment caused her to experience (1) mild restriction in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining

concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration. AR 336. Dr. Tedesco further found as follows:

> The claimant indicates that stress interferes with her sleep, but otherwise it does not appear to affect her activities of daily living. Whatever chronic stress the claimant has encountered, she has been able to work until recently, and ceased working due to her physical impairment. While she understandably may have additional stress and anxiety associated with her physical condition, anxiety per se does not appear to impose more than minimal limitations on the claimant's functioning. She is described as doing well on anti-anxiety medication.

AR 338. Another state agency consultant affirmed Dr. Tedesco's assessment on January 3, 2008. AR 340-41.

### Summary of ALJ's Decision

The ALJ found that Tippie has not engaged in substantial gainful activity since July 6, 2007, her alleged disability onset date. He found her to have the severe impairment of Meniere's Disease, but he further found that this impairment did not equal any of the listed impairments in the regulations.

The ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has a residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; stand or walk for approximately six hours in an eight-hour workday (with normal breaks); sit for approximately six hours in an eight-hour workday (with normal breaks); stoop, balance, kneel, crouch, crawl, and climb ramps/stairs occasionally, but never climb ladders/ropes/scaffolds; and avoid even moderate exposure to hazardous conditions.

AR 13. The ALJ accordingly found that Tippie had the RFC to perform her past relevant work as a housekeeper as it is generally performed and as a secretary as she actually

performed it.  AR 18.  The ALJ thus found Tippie was not disabled from July 6, 2007, through the date of the ALJ's decision.  AR 18-19.

Regarding Tippie's credibility, the ALJ found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [ALJ's] functional capacity assessment."  AR 15.  In this regard, the ALJ found that Tippie's "treatment history, activities of daily living activities, and work history simply do not support her allegations regarding the intensity and frequency of either her episodes of severe roaring tinnitus or acute vertigo episodes.  Therefore, the [ALJ concluded] that both these symptoms are overstated."  AR 16.

The ALJ found that Tippie's "medical records reflect she has reported tinnitus to her physicians, but not that she has reported intense episodes that necessitate rest and complete withdrawal from activity.  Moreover, [she] has not been prescribed any medication for tinnitus."  AR 15 (citations omitted).  "If the tinnitus were of the severity that it completely removed [her] from any activity, it is logical that she would have reported as much to her physicians and it would be treated."  AR 15.

The ALJ further found that Tippie's "activities of daily living are inconsistent with her allegations of both the tinnitus episodes and the acute vertigo episodes."  AR 16.  The ALJ found as follows:

> Although the claimant alleges inability to work, she states that she is primarily responsible for her household.  This is, in part, due to the fact that the claimant's husband's abilities are limited by multiple sclerosis.  The claimant does all the cooking, cleaning, and shopping for her household and is able to climb stairs in her three-floored house with the use of a railing.  She will drive in town and goes for walks.  The claimant does all of her self-care without any problems.  She enjoys a daily jigsaw puzzle on her computer and can recline watching television "for a long time."  These activities simply cannot be reconciled with the claimant's symptoms as described.  The claimant states she cannot reach up or bend down, but she

13

cooks, cleans, and shops, which certainly must involve grabbing items from shelves or cupboards both above and below chest level. The claimant states she cannot tolerate movement, but she enjoys moving around jigsaw puzzle pieces on the computer screen and can watch a television program for hours. Moreover, as the primary housekeeper and caretaker in her home, it is logical to conclude that the claimant is reliable and not frequently incapacitated for periods of extended duration due to her symptoms.

AR 16 (citations omitted).

The ALJ also considered Tippie's work history in assessing her credibility. AR 16. Because Tippie "was able to work with some modification at a physically and mentally demanding job when her symptoms were at their worst," the ALJ questioned whether "she is truly unable to perform any job at this point in time." *Id.*

Further, in considering the medical opinions in this case, the ALJ found as follows:

According to the dictates of Social Security Ruling 96-6p, adjudicators must provide probative weight to the opinions/assessments of non-examining physicians (i.e., DDS medical consultants) if their opinions/assessments are consistent with the record as a whole. The undersigned concludes that the RFC assessment of Dr. Hunter is fairly consistent with the record as a whole, including the treatment records and the claimant's statements as to her activities of daily living and her stated work-related limitations. The statements of Dr. Paparella are not entirely inconsistent with Dr. Hunter's RFC. However, to the extent the opinions and statements are inconsistent, the undersigned concludes they are unsupported by the record. The medical records reflect that the claimant has seen Dr. Paparella only four times in the nearly two years since her alleged onset date. The claimant has not undergone further treatment in that time, other than medication, despite the availability of other options. Moreover, Dr. Paparella's assessment that the claimant has a limited ability to sit for extended periods is unsupported by the claimant's own statement that she is not physically limited to sitting. Finally, Dr. Paparella's statement that the claimant's symptoms were significant enough to affect her capability to perform her job is afforded no weight. The determination of disability is within the sole discretion of the undersigned, and such opinions are not given special significance. Overall, the opinion of Dr. Hunter is more consistent with the record.

AR 17 (citations omitted).

## *Disability Determinations and the Burden of Proof*

The Social Security Act defines a disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking;

(3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page*, 484 F.3d at 1043 (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own

medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at step four, age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards and whether the factual findings are supported by substantial evidence on the record as a whole. *Page*, 484 F.3d at 1042. This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey*, 433 F.3d at 578; *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."). Under this standard, substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010); *see Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1997)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch*, 547 F.3d at 935). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). The court may not reverse the Commissioner's decision "merely

because substantial evidence would have supported an opposite decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## *Discussion*

Tippie argues that the ALJ failed to consider properly the credibility of her subjective complaints and to give controlling weight to Dr. Paparella's opinions, warranting remand for an award of benefits or for further proceedings. The Commissioner maintains, however, that substantial evidence supports the ALJ's determination that Tippie's complaints were not credible and that the ALJ properly weighed the medical opinions of record.

### A.    *Plaintiff's Credibility*

Tippie contends that the ALJ erred in considering the credibility of her subjective complaints by failing to address each of the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Doc. No. 12 at 16. She maintains that the ALJ "simply dismisse[d] her claims of dizziness and tinnitus by saying her allegations are inconsistent with her activities of daily living." *Id.* The Commissioner asserts, however, that an ALJ need not explicitly discuss each *Polaski* factor and that substantial evidence supported the ALJ's finding that Tippie's complaints were not credible. Doc. No. 13 at 13-18.

#### 1.    *Legal Standard*

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). In this regard, an ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.* When evaluating a claimant's subjective complaints, the ALJ must consider

1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii) (codifying *Polaski* factors). Other factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Thus, although an ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008); *see Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (noting that an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary). Further, an ALJ need not explicitly discuss each *Polaski* factor; it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints. *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009); *see Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

### 2.    *Analysis*

In assessing Tippie's credibility, the ALJ first acknowledged the above factors. AR 14-15 (citing 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p). The ALJ then pointed to Tippie's treatment history, activities of daily living, and work history to discount her subjective complaints. AR 15-16.

The ALJ found that Tippie's activities of daily living, such as taking care of her household, cooking, cleaning, shopping, climbing stairs with the assistance of a railing, driving, walking, playing computer games, and watching television, were inconsistent with her allegations of disability. AR 16. Inconsistencies between subjective complaints of

pain and daily living patterns may diminish credibility. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). In particular, "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)) (internal quotation marks omitted). For example, in *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005), the court found that the claimant's daily living activities, including the care of her special needs children, bill paying, laundry, and cooking, were inconsistent with her allegation of total disability. Substantial evidence thus supported the ALJ's finding that the claimant's testimony was inconsistent with the record as a whole. Moreover, in *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999), the ALJ noted that the claimant's daily activities (which included driving his children to work, driving his wife to school, shopping, visiting his mother, taking a break with his wife between her classes, watching television, and playing cards) were inconsistent with his complaints of disabling pain. The evidence as a whole thus supported the ALJ's conclusion that the claimant's complaints of disabling pain were not credible. Further, in *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000), evidence that the claimant cooked, cleaned, did laundry, shopped, studied Russian, exercised, and functioned as the primary caretaker for her home and two small children confirmed the claimant's ability to work on a daily basis in the national economy. *See also Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (affirming ALJ's finding of no disability where claimant "engaged in extensive daily activities," testifying "that she took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals for them, did housework, shopped for groceries, and had no difficulty handling money"). Tippie's testimony about her daily living activities was accordingly a good reason for the ALJ to discount her credibility.

The ALJ further found that Tippie's treatment history belied her claim of disability. AR 15-16. In particular, the ALJ found that Tippie's medical records failed to corroborate

her complaints of panic attacks accompanying her episodes of vertigo. AR 15-16. Dr. Paparella's treatment notes in July and October 2007 and in May 2009 reflect that Tippie's dizziness and vertigo were not as severe after her surgery and that she had not experienced prolonged episodes of vertigo since her surgery. AR 15, 297, 303, 383. A claimant's improvement following treatment is a valid reason to discount the claimant's subjective complaints. *See Johnson v. Astrue*, 628 F.3d 991, 995-96 (8th Cir. 2011) (treating physicians' reports that claimant was "doing well" were inconsistent with levels of pain and fatigue claimant described at hearing, which justified ALJ's discounting of claimant's subjective complaints of disabling pain); *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009) (ALJ may reasonably discount claimant's subjective complaints of disabling pain when the pain is controllable by medication); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (finding claimant's treating therapist's clinical assessment of claimant as "improved" in treatment notes to be inconsistent with therapist's RFC assessment and claimant's claims of disability); *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."); *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996) (claimant's reported improvement with treatment was proper basis to discount subjective complaints). The ALJ also noted that Tippie rarely sought treatment since her alleged onset date of disability for her allegedly disabling symptoms (AR 16), suggesting that they were not disabling. *See Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's failure to seek regular medical treatment is inconsistent with complaints of disabling pain).

Finally, the ALJ properly considered Tippie's work history in assessing her credibility, questioning whether she was "truly unable to perform any job at this point in time," given that she "was able to work with some modification at a physically and mentally demanding job when her symptoms were at their worst" (AR 16). *See Buckner v. Apfel*, 213 F.3d 1006, 1012 (8th Cir. 2000) ("[The claimant's] employment history,

although not extensive, suggests that her ability to work is not more than slightly affected by any physical impairments that she may have."); *Comstock*, 91 F.3d at 1147 (ALJ properly found that claimant's complaints were inconsistent with his work activity and past work history). In sum, Tippie's treatment history, activities of daily living, and work history were good reasons supported by substantial evidence in the record for the ALJ to discount her credibility.

## B.     *ALJ's Consideration of Medical Opinions*

Tippie further asserts that the ALJ erred in failing to provide good, specific reasons for giving less than controlling weight to the opinions of Dr. Paparella, her treating physician, in favor of the opinion of Dr. Hunter, the non-examining state agency medical consultant. Doc. No. 12 at 8-16. The Commissioner maintains that Dr. Paparella's opinions were not entitled to controlling weight to the extent they were inconsistent with other substantial evidence in the record. Doc. No. 13 at 18-22.

### 1.     *Legal Standard*

"The ALJ is charged with the responsibility of resolving conflicts among medical opinions." *Finch*, 547 F.3d at 936. "A treating physician's opinion is generally given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotation marks omitted); *see also* 20 C.F.R. § 416.927(d)(2). "When deciding how much weight to give a treating physician's opinion, an ALJ must . . . consider the length of the treatment relationship and the frequency of examinations. When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010) (citation omitted) (internal quotation marks omitted). In this regard, "[t]he statements of a treating physician may be discounted . . . if they are inconsistent with the overall assessment of the physician or the opinions of other physicians, especially where those opinions are

supported by more or better medical evidence." *Teague*, 638 F.3d at 615. "[A] treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (citation omitted); *see* 20 C.F.R. §§ 404.1527(e)(1), (3), 416.927(e)(1), (3).

By contrast, "the opinions of nonexamining sources are generally, but not always, given less weight than those of examining sources." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(1)); *see also* 20 C.F.R. § 416.927(d)(1). Rather, "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the Commissioner] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). The Commissioner "will evaluate the degree to which these opinions consider all of the pertinent evidence in [the claimant's] claim, including opinions of treating and other examining sources." *Id.*; *see also id.* §§ 404.1527(f), 416.927(f) (discussing rules for evaluating non-examining state agency opinions).

### 2. Analysis

In discounting Dr. Paparella's opinions, the ALJ found that Tippie had "seen Dr. Paparella only four times in the nearly two years since her alleged onset date" and had "not undergone further treatment in that time, other than medication, despite the availability of other options." AR 17 (citing AR 297, 300, 303, 383-85). Indeed, since July 6, 2007, Tippie's alleged onset date of disability, she had only seen Dr. Paparella on July 11 and October 24, 2007, February 27, 2008, and May 22, 2009. The ALJ accordingly "acted within the acceptable zone of choice in declining to give [Dr. Paparella's] opinion controlling weight" because of the infrequent nature of Tippie's treatment visits. *Casey*, 503 F.3d at 693; *see* 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i) ("Generally, the longer a treating source has treated [the claimant] and

the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion."). The ALJ also properly found that Tippie's testimony that she is not physically limited in sitting did not support Dr. Paparella's July 2007 opinion that her ability to sit for extended periods was limited. AR 17, 38, 299. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999) (claimant's daily activities provide relevant basis for rejecting treating physician's testimony); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("If any of the evidence in [the claimant's] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the Commissioner] will weigh all of the evidence and see whether [the Commissioner] can decide whether [the claimant is] disabled based on the evidence [the Commissioner has]."). Further, Dr. Paparella's July 2007 opinion that Tippie's impairment did not affect her vision and speaking contradicted his February 2008 opinion that Tippie's impairment affected her ability to see and to speak (AR 299, 343), undermining the credibility of his opinions. *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (noting that "[a]n ALJ may discount or even disregard the opinion of a treating physician where . . . a treating physician renders inconsistent opinions that undermine the credibility of such opinions"). Finally, the ALJ properly afforded no weight to Dr. Paparella's March 2008 opinion that, despite her improvement after surgery, Tippie's "vertigo still [was] significant enough to affect her capability to perform her job." AR 17, 349. Such an opinion is not entitled to special significance because the issue of disability is reserved to the Commissioner as a dispositive administrative finding. *See Davidson*, 578 F.3d at 842; 20 C.F.R. §§ 404.1527(e)(1), (3), 416.927(e)(1), (3).

Further, in light of the foregoing, substantial evidence supports the ALJ's finding that Dr. Hunter's opinion regarding Tippie's RFC "is fairly consistent with the record as a whole, including the treatment records and [her] statements as to her activities of daily living and her stated work-related limitations." AR 17. Dr. Hunter found that neither Tippie's reported activities of daily living nor any objective criteria supported Dr.

Paparella's July 2007 opinion regarding her functional limitations based on her dizziness. AR 320, 324. Because Dr. Hunter considered "the pertinent evidence in [Tippie's] claim, including [the] opinions [of Dr. Paparella]," the ALJ did not err in giving more weight to that doctor's opinion. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). In turn, the ALJ complied with the Commissioner's regulations by explaining the weight given to Dr. Hunter's assessment. *Cf. Willcockson*, 540 F.3d at 880 ("By explaining the weight given to [the] assessment [of the non-examining state medical consultant], the ALJ would have both complied with the regulation and assisted us in reviewing the decision."); *see* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . .").

Tippie maintains, however, that the ALJ erroneously gave greater weight to the opinion of Dr. Hunter, an osteopathic physician, than to the opinion of Dr. Paparella, a treating specialist. Doc. No. 12 at 11. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources," which include osteopathic doctors. 20 C.F.R. §§ 404.1513(a)(1), 404.1527(a)(2), 416.913(a)(1), 416.927(a)(2). Moreover, although "[i]t is true that opinions of specialists on issues within their areas of expertise are 'generally' entitled to more weight than the opinions of non-specialists[,] [p]hysician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies." *Guilliams*, 393 F.3d at 803 (citations omitted); *see Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000) (rule that specialist's opinion is accorded greater weight than general physician's opinion does not apply where specialist's opinion is controverted by substantial evidence or is otherwise discredited). For the reasons discussed above, Tippie's contention in this regard is unavailing. In sum, the ALJ articulated good reasons supported by substantial evidence in the record for affording less than controlling weight to Dr. Paparella's opinions.

*Conclusion*

For the reasons stated above, the court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Commissioner's decision is **affirmed**, and judgment will be entered in favor of the Commissioner and against Tippie.

**IT IS SO ORDERED.**

**DATED** this 9th day of June, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT